UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No. H-12-25 |
| | § | |
| CHARLES CANNON | § | |
| MICHAEL McLAUGHLIN | § | |
| BRIAN KERSTETTER | § | |
| | § | |

## GOVERNMENT'S TRIAL BRIEF

COMES NOW the United States of America, by Thomas E. Perez, Assistant Attorney General, Department of Justice, Civil Rights Division, and Saeed A. Mody, Trial Attorney, and respectfully submits this trial brief. As stated in the indictment, the defendants are charged in a one count indictment with violating 18 U.S.C. § 249(a). Specifically, the defendants are charged with willfully causing bodily injury to Y.J., because of the victim's actual or perceived race, color, or national origin.

This brief summarizes the Government's anticipated evidence and discusses the statute under which the indictment is being prosecuted. The legal discussion also addresses many of the citations of authority for the proposed jury instructions, which has been filed under separate cover. Trial in this case is scheduled to begin on April 10, 2012.

## I. FACTUAL SUMMARY[1]

### A. Background

On January 18, 2012, the three defendants and Joseph Staggs were charged in an

---

[1] Any recitations of anticipated testimony and evidence in this trial brief are set forth in summary and in part, and do not purport to encompass all witnesses' statements or evidence that will be offered at trial.

indictment with an offense relating to an unprovoked, violent attack by the defendants against Y.J., an African-American male. The indictment's single count alleges that the defendants and Joseph Staggs, while aiding and abetting each other, willfully caused bodily injury to Y.J. because of Y.J.'s actual or perceived race, color, and national origin, in violation of 18 U.S.C. § 249, the Hate Crimes Prevention Act. On March 29, 2012, the one-count indictment against Joseph Staggs was dismissed.

### B. Assault

The charge arises out of an August 13, 2011 incident, which began when the defendants —all shirtless—approached the victim, a stranger, while he waited at a street-corner bus stop in downtown Houston. Minutes prior to the assault, the three defendants did not know each other, but came together on a public street after bonding over white supremacist tattoos. Once McLaughlin and Mr. Staggs removed their shirts, to match the shirtless Cannon and Kersetter, they approached the victim. One defendant referred to the victim as a "nigger." Another defendant repeated the epithet, whereupon the defendants and Mr. Staggs surrounded the victim and beat him about his face, head, and body.

After the defendants and Mr. Staggs attempted to get away, the victim pursued them. The victim then reinitiated a confrontation with the defendants and Mr. Staggs, because he had just been attacked by them and he did not want them to get away. 911 was called, and Houston Police Officers quickly arrived on scene. The victim pointed out the defendants and Mr. Staggs, who were all together, and the police detained them prior to their arrest.

### C. Racial Animus

This attack was not motivated by personal animus, because the victim and defendants

were strangers, and it was not motivated by an attempt to steal property from the victim, because there was no attempt take any property from the victim. As evidenced by the defendants' use of a racial slur in addition to the evidence below of the defendants' racial animus towards African-Americans, the defendants and Mr. Staggs assaulted the victim because he was African-American.

The Government intends to establish that the attack was motivated by racial animus by introducing photographs of White Supremacist tattoos found on all three defendants' bodies, testimony that the defendants bonded over White Supremacist tattoos just minutes before the fight, and testimony that officers heard Defendants Cannon and McLaughlin use the term "nigger" after the police had arrived on scene.

**1. White Supremacist Tattoos**

Deputy Michael Squyres, Gang Investigator for the Harris County Sheriff's Office, will testify that he photographed the defendants' tattoos to document any possible gang affiliation. Deputy Squyres has over seventeen years of experience in gangs and is an expert in White Supremacist gangs, symbols, and ideologies. He will testify to the defendants' tattoos that are expression of White Supremacist beliefs. Deputy Squyres' knowledge of these groups and symbols used by these groups is specialized knowledge, which will assist the trier of fact, as most lay persons are not familiar with these symbols and tattoos or their meanings. See United States v. Hitt, 473 F.3d 146, 158 (5th Cir. 2006), "[e]xpert testimony is admissible if … specialized knowledge will assist the trier of fact." (internal citations omitted). See also, Studebaker v. Uribe, 658 F. Supp. 2d 1102, 1117 (C.D. Cal 2009) ("'Numerous decisions in federal and in other state cases also have upheld the admission of expert testimony to explain the

culture and beliefs of White Supremacy groups and gangs… when such evidence is relevant to issues at trial.'") (quoting People v. Lindberg, 45 Cal. 4th 1, 46-47 (2008)).

The photographs of Defendant Cannon show that he has marked himself with a swastika, SS lightning bolts, and an iron cross – all common symbols associated with White Supremacy.

The photographs of Defendant Kerstetter show that he has marked himself with SS lightning bolts, the number "23", and he has the symbol of Texas on his arm that appears to cover up a swastika that was drawn incorrectly. Deputy Squyers will testify that the number "23" stands for the 23rd letter of the alphabet – W – which means "White."

The photographs of Defendant McLaughlin show that he has marked himself with a swastika, the phrase, "White Pride," two sets of SS lightning bolts, as well as depictions of a skinhead and a Klansman. The photographs also show that the defendant is tattooed with a motto and symbol associated with the Aryan Circle, a white supremacist prison gang.

All of these symbols are associated with White Supremacist beliefs and ideologies. As discussed and argued in detail in the Government's Response to Defendant McLaughlin's Motion to Exclude Tattoo Evidence, the tattoos are not unduly prejudicial under Fed. R. Evid. 403, and are admissible under Rule 404(b) to show the defendants' motive and intent. See Dkt. No. 61.

Defendants Cannon and Kerstetter also had tattoos that are used by individuals who refer to themselves as a "peckerwood" or "wood." Deputy Squyres will testify that the term "peckerwood" is used to describe a white person who supports the white race, however "peckerwood" tattoos are not by themselves necessarily indicative of views of White Supremacy.

2. **Conversation Between Defendants Minutes Before Assault**

The Government anticipates that Joseph Staggs will testify that he and Defendant

McLaughlin were approached by Defendants Cannon and Kerstetter minutes before the assault. Either Defendant Cannon or Kerstetter said, "I told you they were Woods," as they came up to Defendant McLaughlin and Mr. Staggs. Defendants Cannon and Kerstetter also said, "What's up Wood?" to Defendant McLaughlin and Mr. Staggs as all four introduced themselves to one another. During this conversation, Defendant McLaughlin lifted up his shirt to show Defendants Cannon and Kerstetter tattoos that he had on his body. Deputy Squyres will testify that Defendant McLaughlin has two sets of SS lightning bolts tattooed on his chest and torso. One set of lightning bolts, that has a circle around it, is a moniker of the Aryan Circle.

Mr. Staggs will testify that he and Defendant McLaughlin met the other defendants just minutes before the assault. He will also testify that Defendants Cannon and Kerstetter were shirtless when he first saw them and that he and Defendant McLaughlin removed their shirts after meeting up with Defendants Cannon and Kerstetter.

The defendants bonded over being "woods" and Defendant McLaughlin first showed Defendants Cannon and Kerstetter the tattoos he had on his body, before completely removing his shirt to display many of his White Supremacist tattoos. This is strong evidence of the defendants' motive when they approached the victim a few minutes later.

### 3. Racial Slurs Used by Defendants in Presence of HPD Officers

   a. <u>Racial Slur Used by Defendant McLaughlin</u>

When Police Officer Bruk Tesfay arrived at the scene, he observed the defendants and Mr. Staggs laying face-down on the ground. One or two patrol cars were already present, however none of the defendants had been handcuffed. Officer Tesfay heard McLaughlin yell the following statements, in sum and substance, while he was on the ground: "We didn't do anything. Go find the niggers who tried to run us over." McLaughlin was aggressive and

agitated at this time, and he referred to some of the African-American officers on scene as "niggers" as well. These statements were made spontaneously and not in response to any questions by officers. The admissibility of this statement is no longer being challenged by Defendant McLaughlin. See Dkt. No. 68.

      b. <u>Racial Slur Used by Defendant Cannon</u>

Police Officer Jose Mireles was the first officer on scene, and the victim pointed down the street to the three defendants and Mr. Staggs. Officer Mireles stopped very briefly to speak with the victim, and he believes the victim told him that those were the guys fighting. Officer Mireles stopped the four men and waited for backup officers. Within thirty seconds backup arrived, and Officer Mireles removed Cannon from the other defendants and Mr. Staggs. Officer Mireles placed Defendant Cannon in the back of his squad car to determine his identity and to wait for instructions as to whether Cannon would be arrested.

Officer Mireles asked Defendant Cannon a few questions in the back of the squad car to obtain some background information and to distract Cannon, because Cannon was clearly agitated. Canon was respectful towards Officer Mireles, however Cannon would yell and act aggressive towards African-American officers that walked by the squad car. In particular, Defendant Cannon yelled out "nigger" multiple times when Sergeant Samuel Thomas walked by the squad car.

## II. LEGAL ANALYSIS

To establish a violation of 18 U.S.C. § 249(a)(1), the Government must prove the following two elements beyond a reasonable doubt as to each defendant: (1) the defendants willfully caused bodily injury to Y.J.; and (2) the defendant acted because of the race, color, or national origin of the victim.

### A. Willfully Causing Bodily Injury

The first element, as charged in the indictment, requires the Government to prove that the defendants willfully caused bodily injury. Section 249(c)(1) states that, for purposes of the statute at issues, the term "bodily injury" should be given the same meaning as such term is in 18 U.S.C. § 1365(h)(4): "[A] cut, abrasion, bruise, burn, or disfigurement; physical pain; illness; impairment of the function of a bodily member, organ or mental faculty; or any other injury to the body, no matter how temporary." However, bodily injury does not include solely emotional or psychological harm to the victims. 18 U.S.C. § 249(c)(1). In other words, the Government must prove only that the victim suffered an injury to the body, even if the injury was minor or temporary, including pure physical pain. Here, Police Officer James Kneipp will testify that when he spoke to the victim at the scene, the victim was bleeding, appeared dazed and, at one point, the victim appeared as if he was going to collapse. The victim, Y.J., will also testify that he experienced physical pain as a result of the attack.

An act is done willfully if it is done voluntarily and intentionally, with the specific intent to do something the law forbids. United States v. Screws, 325 U.S. 91, 101 (1945). In Bryan v. United States, 524 U.S. 184, 191-93 (1998), the Supreme Court explained that as "a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose'" and that the term "often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental."

In the present case, evidence at trial will prove beyond a reasonable doubt that the defendants acted willfully to cause bodily injury to the victim. The defendants, aided and abetted one another, as they struck the victim multiple times about the face and body. Clearly, the defendants' actions were accomplished with a bad purpose and not by mistake or accident.

### B. Because of Race, Color, or National Origin

The second element requires the Government to prove beyond a reasonable doubt that the defendants acted because of the actual or perceived race, color, or national origin of the victims. The Government is not required to prove that the victim's race, color, or national origin was the sole motivating factor for the defendants' actions. In other words, it does not matter that the defendants had additional reasons for doing what they did as long as the actual or perceived race, color, or national origin of the victims was a motivating factor. United States v. Johns, 615 F.2d 672, 675 (5th Cir. 1980) (rejecting a sufficiency of the evidence challenge to §§ 3631 and 245 convictions) ("The presence of other motives, given the existence of the defendants' motive to end interracial cohabitation, does not make their conduct any less a violation of 42 U.S.C. § 3631"); see also United States v. Craft, 484 F.3d 922, 926 (7th Cir. 2007) (in 42 U.S.C. § 3631 prosecution, "The government was not required to prove, however, that racial animus was Croft's sole motivation in setting the fire"); United States v. Bledsoe, 728 F.2d 1094, 1097-98 (8th Cir. 1984) (fact that defendants may have been motivated by another factor is not a defense if race is also a factor); United States v. Hartbarger, 148 F.3d 777, 784 n.6 (7th Cir. 1998), *overruled on other grounds by*, United States v. Colvin, 353 F.3d 569 (7th Cir. 2003), ("Even if the jury believed that defendants were retaliating against [one of the victims] because of the alleged confrontation, having more than one motive does not change the fact that they had the specific intent to use a racially charged symbol to frighten and intimidate [the victims] and to interfere with their enjoyment of their right to fair housing."); United States v. Johnstone, 107 F.3d 200, 209 (3d Cir. 1997) (approving instruction:"Nor does it matter that a defendant may have also been motivated by hatred, anger or revenge, or some other emotion, provided that the specific intent which I have described to you is present.").

Testimony and evidence will show that the defendants demonstrated their racial motivation before, during, and after the assault of the victim. Before the assault, the defendants bonded over Defendant McLaughlin's White Supremacist tattoos when he lifted his shirt to reveal them to Defendants Cannon and Kerstetter. Defendant McLaughlin then removed his shirt so he too would be shirtless, and all three of the defendants' White Supremacist tattoos would be displayed. Just before the assault, the victim was referred to as a "nigger," prior to the defendants and Mr. Staggs assaulting him. Afterward, police officers heard both Defendants Cannon and McLaughlin use the same racial slur, after the defendants had been detained.

Intent is a state of mind. It can be proven by circumstantial evidence. In fact, it can rarely be established by any other means. In determining what the defendant intended, the jury may consider any statements made or acts done or omitted by the defendant, and all the other facts and circumstances that aid in the determination of knowledge or intent. See United States v. Myers, 972 F.2d 1566, 1573 & n.3 (11th Cir. 1992) ("With regard to specific intent, you are instructed that intent is a state of mind and can be proved by circumstantial evidence. Indeed, it can rarely be established by any other means.").

The victim was a total stranger to all four defendants. The defendants neither robbed nor attempted to rob the victim during the assault. The lack of any other legitimate motivation, combined with the defendants' White Supremacist tattoos, conversation prior to the attack, and the defendants' use of racial slurs in the presence of police officers, will show that the defendants selected the victim, based on the victim's race, color, or national origin.

### III. CONCLUSION

The Government submits this Trial Brief for the assistance of the Court in the above-captioned case.

                                        Respectfully submitted,

                                        THOMAS PEREZ
                                        Assistant Attorney General

                                By <u>/s/ Saeed A. Mody</u>
                                        SAEED A. MODY
                                        Trial Attorney
                                        NY Bar No. 4368080
                                        Department of Justice
                                        601 D St., NW
                                        Washington, DC 20530
                                        Ph. 202.514.5107
                                        Fax. 202.514.8336

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd of April 2012, I electronically filed the Government's Trial Brief with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the following:

1. Gus Saper, Attorney for Charles Cannon
2. Richard Kuniansky, Attorney for Michael McLaughlin
3. Mervyn Mosbacker, Jr., Attorney for Brian Kerstetter

        /s/ Saeed A. Mody  
SAEED A. MODY  
Trial Attorney